Hanna Iron Ore Company of Delaware v. Commissioner.
Hanna Iron Ore Co. v. Commissioner
Docket No. 110009.
United States Tax Court
1943 Tax Ct. Memo LEXIS 12; 2 T.C.M. (CCH) 1159; T.C.M. (RIA) 43526; December 28, 1943
*12 Petitioner's investment of $185,313.75 in stock of Stambaugh Iron Company and the amount due to it by reason of advanced royalties and idle mine expenses, aggregating $270,059.56, determined to have become worthless in 1935 and deductions therefor allowed. John E. Laughlin, Jr., Esq., 2812 Grant Bldg., Pittsburgh, Pa., for the petitioner. Paul E. Waring, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $23,855.55 in the petitioner's income tax for the year 1935. The issues are: 1. The deductibility of $270,059.56, representing a bad debt due from the Stambaugh Iron Company. 2. The deductibility of $185,313.75, representing a loss due to the worthlessness of the petitioner's stock in the same company. Findings of Fact Certain facts were stipulated and as so stipulated are adopted as findings of fact. The material portions thereof are as follows: The petitioner is a corporation organized and existing under the laws of the State of Delaware. It filed its corporation income and excess-profits tax return for the calendar year 1935 with the collector of internal revenue for the 18th district of Ohio. On December *13 29, 1917, the Stambaugh Iron Company, hereinafter called Stambaugh, was incorporated under the laws of the State of Ohio. On January 1, 1918 Stambaugh, which was qualified to do business in the State of Minnesota, entered into an agreement of lease with Clark Iron Company, Weed Iron Company, and Guilford G. Hartley and Carrie E. Hartley, his wife, lessors, under which the lessors leased to Stambaugh certain property located in the County of St. Louis, Minnesota, known as the "Billings Mine" for a term of fifty years, in consideration of royalties to be paid by Stambaugh at the rate of 75 cents per gross ton of ore mined, with a minimum of 100,000 gross tons to be mined in each calendar year beginning July 1, 1919. The lease further provided that in case less than the minimum annual tonnage should be mined such deficient production might be removed in a subsequent year free from royalty, provided the stipulated minimum tonnage should be mined and shipped in that year. Stambaugh also agreed to pay all taxes on the lands, improvements and personal property at the mines and on the iron ore produced therefrom. On or about April 10, 1918 The Tod-Stambaugh Company, hereinafter called Tod-Stambaugh, *14 entered into an agreement with Sharon Steel Hoop Company, hereinafter called Sharon, pursuant to which Tod-Stambaugh sold to Sharon one-half of the capital stock of Stambaugh, and Sharon agreed, among other things, to purchase from Stambaugh 50,000 tons of iron ore during the year 1919 and 100,000 tons of iron ore during each year thereafter. Under that agreement Sharon acquired one-half of the capital stock of Stambaugh. Tod-Stambaugh and Sharon agreed to lend to Stambaugh whatever amounts it would need to pay the royalty, and also agreed to pay taxes and other incidental expenses. The contract further provided that Sharon and Stambaugh might be "excused" from taking all of the 100,000 tons by paying to Stambaugh the minimum royalties which the latter company was compelled to pay under the provisions of the January 1, 1918 lease. The contract also provided that Sharon should not be compelled in any year to take a grade of ore chemically or physically unsuitable for the production of iron to be used to make steel, in accordance with the general blast furnace practice then prevailing in such year in the Mahoning and Shenango Valley and in the Cleveland and Pittsburgh districts Saron *15 and Tod-Stambaugh agreed not to sell their Stambaugh stock without giving their co-owners an option to purchase it. The purpose of the contracting parties was to develop the Billings Mine to an annual production capacity of 300,000 tons of ore. On October 13, 1921 Tod-Stambaugh, Sharon, the Ohio Iron and Steel Company, hereinafter called Ohio, and The Youngstown Iron and Steel Company, hereinafter called Youngstown, entered into an agreement providing that Ohio, as owner of certain Stambaugh stock transferred to it by Sharon, and Tod-Stambaugh consented to the issuance of $400,000 of Stambaugh stock to Youngstown as the virtual nominee of Sharon (the owner of all of the capital stock of Youngstown). On December 31, 1921 all of the issued and outstanding capital stock of Stambaugh was owned as follows: Date Acquired
Name of Stockholder
No. of Shares
Total
June 7, 1919
Sharon Steel Hoop Company
5
$ 500
The Tod-Stambaugh Company
5
500
The Tod-Stambaugh Company
45
4,500
May 7, 1919
Sharon Steel Hoop Company
45
4,500
Dec. 31, 1921
The Ohio Iron & Steel Co.
990
99,000
Dec. 31, 1921
Sharon Steel Hoop Company
3,960
396,000
Dec. 31, 1921
The Tod-Stambaugh Company
4,950
495,000
10,000
$1,000,000
*16 In May 1926 The M. A. Hanna Company, an Ohio corporation, hereinafter called Hanna (Ohio), acquired all of the issued and outstanding capital stock of Tod-Stambaugh. On September 30, 1925, Tod-Stambaugh entered into an agreement with Sharon, amending in certain respects the agreement of April 10, 1918. Included in these changes were the shut-down of the Billings Mine during 1926, 1927 and 1928, with the option granted to either party to open and place the mine in production during 1928, or later upon proper notice; the advancement to Tod-Stambaugh of the minimum required royalty; and the payment of other expenses of Stambaugh by the stockholders pro rata. Sharon also agreed to take 100,000 tons of ore during the said three years on certain specific terms. On October 30, 1925 the lessors of the Billings Mine and Stambaugh entered into an agreement, amending in certain respects the lease agreement of January 1, 1918. The agreement provided for the suspension of mine operation, at Stambaugh's election, until December 31, 1935; the reduction of the royalty to 50 cents a gross ton; the reduction of the required minimum production to 50,000 tons per year; the liquidation of the Stambaugh *17 royalty credit at the original rates; and the grading of its straight-stripping ore at not more than 49 per cent. On April 20, 1928 Hanna (Ohio) entered into an agreement with Sharon, represented by a standard form ore contract and rider, covering the purchase of 80,000 tons of iron ore from mines in St. Louis County, Minnesota, for $330,400. Subsequently immaterial amendments were made thereto. On November 8, 1928 Tod-Stambaugh and Sharon entered into an agreement, further amending the agreement of April 10, 1918 by providing that during 1929, 1930 and 1931 Hanna (Ohio) would supply Sharon with 450,000 tons of ore at the market price less 10 cents a ton, with no credit for prepaid royalties. Hanna (Ohio) agreed to pay the "idle" expenses of the Billings Mine chargeable to Sharon and Tod-Stambaugh and to pay the advance royalty minimum payments during the three-year period. On September 30, 1929 the petitioner acquired from Tod-Stambaugh its holdings of the capital stock of Stambaugh. The petitioner's basis with respect to such stock is $185,313.75. On June 4, 1930 the petitioner assumed the obligations of Tod-Stambaugh under the latter's agreement with Sharon dated April 10, 1918. *18 During the period beginning May 1, 1926 and ending November 30, 1935 Hanna (Ohio) and the petitioner paid to Stambaugh certain sums of money. Between May 1, 1926 and September 30, 1931 Hanna (Ohio) advanced to Stambaugh $93,750, to be used to pay minimum royalties, and $42,820.20, to provide for idle mine expenses. Certain other sums were advanced to Stambaugh by Hanna (Ohio). The balances of such accounts were transferred to the petitioner's books and characterized thereon as contributions to its paid-in surplus by Hanna (Ohio). From October 1, 1929 to October 31, 1935 the petitioner advanced to Stambaugh on open account $75,000 for royalty payments and $46,722.56 for mine maintenance expenses. From October 1, 1929 to November 30, 1935 the petitioner advanced to Stambaugh for miscellaneous purposes certain sums on which repayments were made, leaving an unpaid balance of $11,766.80 on December 31, 1935. From January 1, 1927 to October 31, 1934 Sharon also made various advances to Stambaugh for purposes similar to those relating to the petitioner's advances. Pursuant to the April 10, 1918 agreement and its amendments the petitioner made the following payments: Advanced
Idle Mine
Year
Royalty
Expense
Total
1926
$ 18,750
None
$ 18,750.00
1927
25,000
$20,000.00
45,000.00
1928
25,000
13,000.00
38,000.00
1929
25,000
9,820.00
34,820.00
1930
25,000
10,665.85
35,665.85
1931
25,000
10,250.73
35,250.73
1932
9,375
21,805.98
31,180.98
1933
19,625
None
19,625.00
1934
None
None
None
1935
None
11,766.80
11,766.80
$172,750
$97,309.56
$270,059.56
*19 The petitioner's ledger account shows that the investment in Stambaugh of $455,371.31 on December 31, 1935 was written off by the petitioner as of that date by the following journal entry: J345 - 12-31-35
Capital Surplus
$455,373.31
Investment - Stambaugh Iron Co. $455,373.31 To write off the loss of the investment in Stambaugh Iron Company to Capital Surplus. This company was liquidated December 18, 1935. This write off was approved by resolution adopted by the directors at their meeting, 1936. On June 8, 1933 Stambaugh and the lessors of the Billings Mine further modified their original agreement by eliminating mine royalties from July 1, 1933 to December 31, 1935. Pursuant to negotiations between Stambaugh and the lessors, on October 15, 1935, the lessors agreed to reduce the royalty to 37 1/2 cents a ton and the annual mine production to 50,000 tons for the period from January 1, 1936 to January 1, 1946. The lessors also consented to the flooding of the mine if it were not reopened or the lease cancelled. At the time the petitioner received from the lessors the proposal which resulted in the agreement of October 15, 1935, it wrote to Sharon stating that the general *20 manager of the petitioner had filed his complete estimate of the cost of reopening the Billings Mine and of the probable character and content of the ore produced therefrom. The cost of opening the mine was estimated to be $125,735 and the ore content to be: Iron natural 49.00, phos. dried .074, silica dried 7.25, and moisture 14.00. The petitioner also agreed to guarantee the accuracy of the estimated mine costs subject to adjustment for changes in freight and labor rates and for supply costs and taxes. It estimated that the profit from a production of 100,000 tons would be 30 1/2 cents per ton, plus a cash return of $18,750 per year from prepaid royalties. On September 23, 1935 the petitioner wrote to Sharon demanding that Sharon perform its obligations pursuant to the April 10, 1918 contract. On September 30, 1935 Sharon replied that it believed that the petitioner was not entitled to additional advances until certain requested information was supplied and Sharon could be assured of reasonable profit. Sharon accused Tod-Stambaugh and the petitioner of breaches of contract and failure of performance. Sharon therefore demanded that the petitioner's president terminate the Billing *21 Mine lease and liquidate Stambaugh. On September 30, 1935 certain directors of Stambaugh, representing the Sharon interests, wrote to the petitioner's president and others as officers of Stambaugh, stating that in view "of this formal notice" from Sharon that its situation would "not be such as to take further ore from the Billings Mine and the apparent lack of available sales of such ore by its sales agent which will justify continuing to hold the property" they demanded the immediate cancellation of the lease. On previous occasions Sharon had voiced its belief that the lease should be cancelled. On December 18, 1935, pursuant to prior action duly and formally taken, all of the Stambaugh stockholders agreed to its immediate liquidation and dissolution. Pursuant to the agreement and in the consideration of the assumption by Williams Ore Company of all obligations of Stambaugh (except obligations to its shareholders and to Tod-Stambaugh), on the same day all of the assets of Stambaugh were sold to Williams Ore Company, hereinafter called Williams, a Minnesota corporation organized November 23, 1935, with a capital stock of 100 shares, all of which was acquired by the petitioner for *22 $1,000 in cash. On December 20, 1935, Stambaugh was dissolved. As of November 21, 1935 the property acquired from Stambaugh was set up on Williams' books as follows: Debit
Credit
Stores
$ 1,015.81
Cost of plant - equipment
and leases
17,932.16
Advance royalty - Debit
242,593.55
Advance royalty - Credit
$242,593.55
Prepaid insurance
930.75
Material purchases un-
paid
10.50
Taxes accrued - State and
local
19,866.30
Compensation and public
liability insurance, ac-
crued
1.92
Total
$262,472.27
$262,472.27
The following schedule sets forth by years, during the period beginning April 1, 1919 and ending December 31, 1935, the gross tons of ore shipped by Stambaugh from the Billings Mine, the losses of the company from its operations, the amounts carried by it as deferred royalty, and the company's accumulated deficits: Tons of Ore
Losses from
Year Ending
Shipped
Operations
Deferred Royalty
Deflcit
4-1-1919
4-1-1920
23,917
$ 262.73
4-1-1921
111,959
$ 51,609.45
66,298.55
4-1-1922
123,083.96
175,416.41
4-1-1923
107,072
109,009.81
281,957.79
4-1-1924
188,840
29,578.79
315,227.61
4-1-1925
100,278
125,556.21
$ 32,045.56
428,512.95
12-31-1925
44,415
83,123.15
22,993.99
524,024.64
12-31-1926
35,435.51
25,000.00
557,396.88
12-31-1927
14,667.33
25,000.00
572,064.21
12-31-1928
39,455.58
25,000.00
611,519.79
12-31-1929
21,331.70
25,000.00
632,851.49
12-31-1930
20,501.46
25,000.00
653,352.95
12-31-1931
21,611.96
25,000.00
674,964.91
12-31-1932
20,851.58
25,000.00
695,816.49
12-31-1933
21,754.53
12,500.00
717,571.02
12-31-1934
23,830.27
741,401.29
7-1-1935
23,330.62
764,731.91
Total
576,481
$764,731.91
$242,539.55
*23 Sharon purchased ore from the Billings mine as follows: Year ending
Tons
April 1, 1920
23,340
1921
100,591
1923
99,417
1924
100,620
1925
100,117
To Dec. 1, 1925
44,516
468,601
The following schedule sets forth by years, for the period beginning November 23, 1935 and ending December 31, 1940 the tons of ore mined by Williams, its sales of ore, its income or losses, its capital stock account, and its accumulated surplus or deficit account: Tons Ore
Brokerage
Net
Year
Mined
Sales
Income
11/23 to
12/31/35
None
None
None
1936
None
None
None
1937
None
$1,237,757.11
$3,712.07
1938
None
1,793.39
None
1939
None
845,564.66
7,519.66
1940
None
19,991.27
None
Net
Capital Stock
Surplus
Year
Loss
(Par)
or Deficit
11/23 to
12/31/35
None
$1,000
None
1936
None 1,000
None
1937
None 1,000
+$ 1,642.46
1938
$21,465.42 1,000
-- 19,822.96
1939
None 1,000
-- 13,281.05
1940 95,645.72 1,000
--108,926.77
At the time of its liquidation and dissolution Stambaugh was indebted to its stockholders, on open accounts, in the following amounts: Name of Stockholder
Name of Account
Amount Due
The Petitioner
Current
$ 11,766.80
The Petitioner
Royalty
168,750.00
The Petitioner
Special Current
89,542.76
Sharon Steel Hoop Company
Royalty
90,576.59
Sharon Steel Hoop Company
Special Current
118,802.16
The Ohio Iron & Steel Co.
Special Current
15,858.56
*24 Sharon made advances for current expenses to Stambaugh aggregating $73,684.20 from June 1927 to October 1933, inclusive, and made a final advance of $45,117.96 in December 1935. It also made royalty advances of $90,576.59 through June 1933. On December 18, 1935 the petitioner and Sharon entered into a contract providing for the sale by the petitioner of 540 tons of "Hanna Grade" standard Lake Superior Mesaba nonbessemer iron ore. The record discloses the following additional facts: The petitioner is a wholly owned subsidiary of National Steel Corporation, hereinafter called National. It is managed and operated by Hanna (Ohio), a corporation engaged in the exploration for and the opening, developing and operation of iron ore properties. National manufactures steel products, including tin plate, and owns the stock of a number of iron ore producing companies. The petitioner had operating mines other than the Billings Mine and owned many unoperated ore reserves as a protection for future ore supply. Stambaugh credited on its books the minimum royalties paid on the Billings Mine as assets because they represented the right in any future year to receive ore free from royalty in excess *25 of the minimum requirement of that year. In 1935, after the petitioner, through Stambaugh, secured reductions in the royalty charged and the annual minimum production requirement, it started negotiations with Sharon for the reopening and operation of the Billings Mine. It based its action on the reports and estimates of its engineers and the agreement of Sharon to take 100,000 tons of ore per year. The petitioner would consume an equal amount, and thus it planned to recover the advanced royalties in two or three years. In 1931 Henry A. Roemer became a directory of Sharon and is now its president. At the time he became associated with Sharon, the agreement of April 10, 1918, relating to the Billings Mine was considered by him and by the directors as an "unfavorable contract." Sharon was in a precarious financial condition at that time and that situation continued through 1935. The ore from the Billings Mine was called "low-grade ore" and was considered unsatisfactory for the particular operations carried on by Sharon. Sharon was not interested in building up reserves of that kind of ore. The ore was satisfactory for other blast furnace operations except that the lower metallic content *26 increased the cost of pig iron. Sharon did not want the Billings Mine reopened because, in that event, it would be required to purchase the 100,000 tons of ore as provided in the agreement of April 10, 1918. Iron ore was available to Sharon from sources other than the Billings Mine. The contract of December 18, 1935 between Sharon and petitioner enabled Sharon to obtain the grade of ore wanted and needed by it. Pursuant to the agreement of October 30, 1925 between Stambaugh and the lessors of the Billings Mine the mine was flooded with water and has so remained. No iron ore has been removed therefrom since that date. The petitioner's investment in Stambaugh stock, purchased at a cost of $185,313.75, and its account receivable due from Stambaugh for money advanced for the payment of royalties, idle mine expenses and miscellaneous expenditures, aggregating $270,059.56, both became worthless in 1935. Opinion VAN FOSSAN, Judge: This case presents two issues of fact. They both turn on the financial conditions of Stambaugh and other considerations in 1935 and, hence, will be considered together. There is no controversy as to amounts. In 1929 the petitioner acquired the stock in question *27 from Tod-Stambaugh at a cost of $185,313.75. During the period from 1926 to October 31, 1935 the petitioner also made loans to Stambaugh aggregating $270,059.56 to enable it to pay the advanced royalties required by the lease agreement between Stambaugh and the lessors of the Billings Mine and to provide for idle mine expenses, taxes, and miscellaneous costs necessary to keep the lease alive and to preserve and conserve the property. We deem it unnecessary to repeat in detail all the events which led to the dissolution of Stambaugh. Briefly the salient facts are: The petitioner and Sharon, individually and through affiliates, were the equal owners of the stock of Stambaugh, the lessee of the Billings Mine. From 1920 through 1925 the mine had produced 576,481 tons of ore. Sharon had consumed almost all of that output. The mine was shut down in 1925 and has not been reopened. During the period from 1926 to 1935, inclusive, pursuant to the 1918 contracts, both the petitioner and Sharon advanced large amounts to pay advanced royalties, taxes and idle mine expenses of Stambaugh. The petitioner furnished more money than Sharon. The terms of the original lease were modified to impose a *28 less carrying burden on the petitioner than on Sharon. No change in the situation occurred until 1935. In September of that year the petitioner and Sharon engaged in an exchange of views looking toward the abandonment or the development of the Billings Mine. The petitioner was negotiating with the lessors for easier terms and the reduction of the royalty and minimum production requirements. The petitioner urged the reopening of the mine. Sharon took the opposite position. The petitioner then demanded that Sharon perform its obligations pursuant to the April 10, 1918 contract. Sharon refused and demanded that the petitioner's president terminate the lease and liquidate Stambaugh. The directors of Stambaugh, who represented Sharon's interests, wrote to the petitioner's president, stating that in view of Sharon's situation, which would not permit its further consumption of Billings ore, and of "the apparent lack of available sale of such ore by its sales agent which would justify continuing to hold the property," they consented and demanded that the lease be cancelled at once, and threatened to hold the petitioner's president and the other directors responsible for losses which might *29 be occasioned by their failure to do so. Thereupon all of the Stambaugh stockholders agreed to liquidate and to dissolve the corporation. Prompt action was taken by selling all of Stambaugh's assets to Williams and immediately dissolving the corporation. The petitioner and its affiliates owned a large amount of iron ore acreage, including both operating and undeveloped mines. It needed a large tonnage of ore for its own consumption and hence was concerned with obtaining and maintaining an adequate supply for future use. On the other hand, Sharon had a particular kind of operation to which the Billings ore was not suited. It was not interested in ore reserves. Its financial condition was none too secure. Both companies continued to support the Billings investment for a number of years, each contributing to the payments required by the lease. From April 1, 1920 to December 1, 1925 Sharon had used over 450,000 tons of ore from the mine. For various reasons Sharon concluded that it no longer wanted to carry the burden of its contractual commitments made on April 10, 1918. In 1935 when Sharon refused to make additional advances and demanded the liquidation of Stambaugh, the petitioner *30 had no other course than to comply with such demand. The liquidation and dissolution of Stambaugh demonstrated, and the petitioner ascertained and determined, that its stock and the debt due from that company had no value. Prior to such time no event had occurred establishing this fact. It is clear that before the dissolution of Stambaugh the petitioner considered that both its stock and the account due from that company had value. In fact it was making detailed plans to reopen the mine. It expected to recover therefrom the advanced royalty payments within two or three years. It was supported by the favorable report and estimates of its engineers and needed only the consent of Sharon to start operations. As we have seen, Sharon, for its own peculiar reasons, withheld its consent and by its own affirmative action caused the cancellation of the lease and liquidation of Stambaugh. The respondent argues that the advanced royalty and idle mine expense payments were compulsory and hence deductible in the year paid. The simple answer to this is that as to petitioner these payments were advances or loans. Neither the actual royalties nor the expenses were obligations of the petitioner. *31 If deductible, they were deductible by Stambaugh. Respondent also argues that such advances were worthless when paid. The facts do not support respondent on this point. As the name implies, the advanced royalty payments were made with the intention of being absorbed during the current year, if the mine were operated, or of building up a reserve fund which would offset royalty charges during future years. Had Sharon continued to take the Billings ore, or some other outlet been found, we have no doubt petitioner's investment in Stambaugh stock would have been profitable. The respondent also asserts that the petitioner should have known in October 1925 and thereafter that no recoupment was possible because of the low metallic content of the ore and of the flooding of the mine. We can not agree with this contention. The low-grade ore obtained from the Billings Mine was suitable for use in blast furnaces other than those operated by Sharon. The flooded mine could have been "dewatered," a process contemplated and suggested in the petitioner's proposal to Sharon made in September 1935. The respondent's theory is predicated on the assumption that for many years prior to 1935 the Stambaugh *32 lease was utterly worthless and that the accumulated advanced royalties had no value whatever. This assumption is contrary both to the fact and to probability. It is wholly inconceivable that companies such as the petitioner and Sharon, whose officers were thoroughly familiar with iron ore mining, would have paid out almost $500,000 (as shown in the "Royalty" and "Special Current" accounts) to preserve their rights under a lease that had no value at all. Moreover, those payments were made after the petitioner had made a financial investment of over $185,000. In our view, the action of Sharon in refusing to join the petitioner in the reopening of the Billings Mine and in compelling the dissolution of Stambaugh was the "identifiable event" which caused both the petitioner's stock in, and debt due from, Stambaugh to become worthless. Prior to that occurrence these assets had considerable real value and perhaps a much larger potential value. All value was obliterated in 1935. The respondent further argues that the sale to Williams constituted a nontaxable reorganization. We are not impressed by this additional argument. The record contains nothing to justify that conclusion. Sharon demanded *33 the dissolution of Stambaugh. The petitioner acceded to that demand and proceeded with the liquidation and dissolution in the regular manner. All stockholders signed the agreement for dissolution and the sale of the assets to Williams. Williams was a complete stranger to the Sharon stockholders. It matters not that the Williams stock was owned by the petitioner. The Williams corporation was a separate entity. We see no basis for holding that the transaction came within the statutory definition of a reorganization. Decision will be entered under Rule 50.